Call the first case. Good morning, everyone. Will the attorneys who are going to orally hire you this morning, would you please come up to the podium and introduce yourselves. For the appellant, who would that be? Good morning, Your Honor. Ellen Jenkins on behalf of the appellant. Ellen Jenkins? Yes, sir. And the appellee? Tim Eaton. Mr. Tim Eaton. Okay, both sides will have 20 minutes to argue. For you, appellant, bear in mind that if you want to have a rebuttal, you'll save some of that 20 minutes for your rebuttal, okay? Yes, thank you. The microphone before you is not a public address system. It's here solely to record the proceedings. So if you want to make sure that everyone in this room hears your argument along with us, please keep your voices up. You won't offend anyone by talking loudly. As a matter of fact, I personally would appreciate it. Okay, let's begin. Ms. Jenkins, you may proceed. May it please the Court. At its core, this case is about whether St. Leonard's had a duty to protect the plaintiffs from Mr. Anderson's crimes. Plaintiffs have identified three sources of that duty. Ordinary negligence principles, section 319 of the restatement, and the voluntary undertaking doctrine. All three of these standards require plaintiffs to prove overlapping elements, including that their injuries were foreseeable and likely, and that public policy favors the imposition of a duty. Under section 319, plaintiffs would have to make an additional showing, that is, that St. Leonard's took charge of Mr. Anderson. Doesn't 319, in your view, simply encompass the ordinary principles that we look to and the four factors that we look to in finding duty? Isn't 319 just one way to look at those four factors? I think you're correct, Your Honor, that it's a similar analysis. But in Illinois, the general rule is that a defendant doesn't have a duty to protect another. I understand, but there's an exception to that rule. It is, and the exception applies when the defendant has taken charge, i.e., has the authority and the means to control the defendant. In your view, has our Supreme Court adopted 319? The Supreme Court, I don't believe, has spoken, at least in this context. Are you familiar with the Johnson case? Johnson. Versus, I can tell you in a minute. It is a case in which the court analyzed 319 in a similar context. The Supreme Court has certainly adopted section 315. Johnson versus Condell Memorial Hospital. I'm sorry to interrupt you. No, I'm sorry. The Supreme Court has certainly adopted section 315, which sets forth the general rule, and all of the exceptions. And this case involves section 319, which is the take charge exception. And I think in the Condell case, that involved a patient at a hospital. Exactly. Who left and then caused harm to the plaintiffs. So under 319, the plaintiffs have to prove that St. Leonard's took charge of Mr. Anderson. One more question, and then I'll let you go. Sure. Can't the issue of whether the defendant took charge be a factual one that the jury could decide, even though duty is a question of law? Duty is a question of law, and we believe that the facts here could lead to only one conclusion. But if the court were to refer that question, that particular sort of fact-intensive question to the jury, I think the jury would have to receive a proper instruction, which did not happen in this case. Okay. So it could be a fact. You're not disagreeing that it could be a fact question, but if it is a fact question, then the jury would stop properly instructing. Yes, ma'am. You know, a lot of duty cases turn on, for example, whether a person is a business invitee. Right. And so fact questions can be embedded in the duty question. But in that event, I think the jury has to know what principles guide whether a duty applied. Okay. And in this case, the court instructed the jury that there was a duty. The court instructed the jury in a way that assumed the existence of a duty, and one of our positions is that how can the trial have been fairly conducted, given that St. Leonard's has been held liable in negligence, but neither the court nor the jury ever decided in the first instance whether St. Leonard's owed a duty? Well, I think the plaintiffs would disagree with you on that and say that the jury, that the trial quite implicitly found that. Well, they've made that argument, but if you look at the record, the circuit court's comments make it clear. We think that the court referred that question to the jury. In fact, when St. Leonard's moved for a directed verdict after the close of all of the evidence, the court said, well, the jury will decide the duty question, hopefully tomorrow. So with the exception of Anderson and defendant, every other party's been dismissed or settled. Why are we here? Can you repeat that? I'm sorry. With the exception of Anderson and defendant, every other party defendant was dismissed or settled. Well, Mr. Anderson actually was dismissed during the middle of trial. So by the time the jury was deliberating, St. Leonard's was the only defendant in the case. All of the other defendants, including the psychologist that had evaluated Mr. Anderson, the parole board and a couple of other individual doctors had settled well before trial, I believe. We've discussed in our briefs at length the Abraham case and the Baylor case. I'm not going to go through all of those facts again. The Baylor and the Indiana case? It's a Seventh Circuit case decided under Indiana law, but Indiana law follows Restatement Section 319, and the facts are closely analogous. The plaintiffs in their briefs cited a Virginia Supreme Court decision called Dudley, and that case is distinguishable because in that case the facility took custody of the parolee, actually of the perpetrator. This case is different. There the parolee had been, the offender had been denied parole. But more important, the contract in that case required the facility to maintain stringent security measures. They had no armed guards. They had no specific constraints that would normally have been involved in complex cases that have high stakes. Some of the facts in that case are similar, but I think it's dispositive that the state gave custody of the individual in that case to the facility, and therefore the facility, even under its contract, had to closely supervise and 24-7 monitor the whereabouts and activities of the perpetrator. Was Anderson included in that metric? I'm sorry? Was Anderson included in that metric? Well, I was referring to the Virginia case. In this case, the state retained custody of Anderson and was responsible for tracking his movements, at least while he was off the premises. There were no armed guards. There were no locks on the doors. The St. Leonard's personnel could not stop Mr. Anderson from leaving if he wanted to. There was a sign-in, sign-out sheet, which is a common fact in all of these cases. But here, if Mr. Anderson left without signing out or went AWOL, all that St. Leonard's could do was contact IDOC or the police department so that they could take appropriate action. Realistically, St. Leonard's couldn't do anything else. It couldn't arrest him. It couldn't detain him. So we think that those facts are dispositive because St. Leonard's did not have the degree of control that the Section 319 cases require. Well, how much control are you saying is required? Short of a jail, which certainly exercises sufficient control. Sure. Prison, they have control. So where is that line drawn, in your view? Not here because the arrangement with the state did not allow St. Leonard's to lock Mr. Anderson in. It's not a lockdown facility. Correct. Is that a necessary requirement in your view? I think that it's highly suggestive of a lack of control because if you can't stop someone from leaving, how can you control their activities? There was an ankle bracelet, which they had. I understand your client didn't have the monitoring facility for it. I mean, you know, they could check his room. They made him sign in and sign out. They provided money to leave. Bus passes. They had some control. Your Honor, I believe that St. Leonard's had control over Mr. Anderson's movements, activities, whereabouts on the premises. But once he was in the public domain, then it was the state's responsibility, law enforcement, to track him and take control of him. St. Leonard's is not law enforcement. It's a not-for-profit entity trying to do a public good. So we just think that this case does not fall within the Section 319 exception. He checked out at night, didn't come back. What were they required to do when he didn't return? He actually didn't check out. He just left without checking out, Your Honor. And under the contract, St. Leonard's was required either to contact the Illinois Department of Corrections, or if it was an apparent crime had happened, St. Leonard's was to call the police department. I'd point out, Your Honor, that a captain from the Chicago Police Department testified in the case, and he was asked, what would the police have done if St. Leonard's had called 911 to report that Mr. Anderson had jumped his parole? And he said, we would not have searched for him. Understandably, the Chicago Police Department probably doesn't have the manpower to go searching for all parole violators. And your client did notify IDFC, correct? Did. Did. Did, when they discovered that Mr. Anderson was missing. But by that time, Your Honor, Mr. Anderson's ankle bracelet had sent an out-of-range signal to the monitor. And so IDOC knew very early on that he had absconded. And I would note that the ankle bracelet was triggered if Mr. Anderson proceeded, I think, 100 feet from St. Leonard's. So he didn't get a very big head start before IDOC knew he was gone. I'll move on. On the supplementing the record for interrogatory three, that was tendered during the trial? It was, it was, well, there's a dispute over that, Your Honor. Counsel, we understand that it was tendered in a handwritten form, and there's a dispute. And the circuit court refused to supplement the record with the handwritten version of that special interrogatory. However, under the case law, if the transcript is clear what the text of the special interrogatory was, then I think, and it is in this case. You have to just read the transcript. I think that you are allowed to consider it as part of the record. And if you're right on that, we don't even need to get to the supplement. I do not believe you need to, if you agree with our interpretation. And I think it's a... What was the failing of the appellant here that you believe led the jury to render a verdict for plaintiffs? What was their failing? What did they fail to do? Well, I think they, there were a number of trial errors, if that's what you're asking. I think that the jury here was not properly instructed. If the court did refer the jury question, the duty question to the jury, and I think it's clear that it did, then the jury should have received a special jury, a non-pattern jury instruction tracking 319. But there's also, the circuit court deprived St. Leonard's of its right to pursue a sole proximate cause defense. Decided that on a motion in limine, essentially the circuit court took that defense off the table before the trial began. That deprived St. Leonard's of a right. And as the court did not approve the case, the court then denied the defendant a sole proximate cause defense. We think that the court, the cases say that so long as the defendant denies causation in its answer, it may try to make out a sole proximate cause defense. We think that that ruling by the circuit court was highly prejudicial, and it tainted the entire trial from the very beginning. What required them to have the psychologist do this investigation and determination regarding whether or not he was a sexually violent person? Your question was what required that? Yes. The state law before a convicted felon, incarcerated felon, a sex offender, is suitable for release on parole or eligible for release on parole. The state retains experts, criminal psychologists, to examine the records and here affiliated had all of Mr. Anderson's records to tell the parole board, yes, he's suitable for parole because we don't believe he's a significant danger to society. That's what happened in this case. That was basically the genesis of everything that followed. If I may, Your Honors, I'd like to address the public policy issues. Regardless of the duty source, this court must consider public policy before imposing a duty on St. Leonard's. In the Alm case reported at 134 Illinois at 3rd 716, this court explained that the imposition of a duty in a negligence case is an act of judicial policy making. And the Illinois courts have extended the concept of duty with caution and restraint. As the evidence shows, St. Leonard's provides a host of services to parolees that the state has declared suitable for release on parole. The legislature could have decided that it would be better to keep convicted felons behind bars until they complete their sentences and then release them onto the streets without any services or counseling at all. But the legislature decided that it's better public policy to send parolees to facilities like St. Leonard's where they can receive counseling and services aimed at helping them reintegrate. It is not inconsistent with that public policy to say it's a halfway house. So somewhere between all the control of the prison and the normal control of society is a halfway house which also has a duty to the public. That's not inconsistent counsel. I don't see why that's inconsistent. The halfway house has a role. Yes, I agree with you. But it's not to be a private prison. I agree with that too. The parole board and the psychologists are the gatekeepers for deciding. And people are going to get through those gates who shouldn't. It's going to happen forever. The system is not perfect. And this case shows that very painfully. But the policy judgment is whether you impose burdens on halfway houses such that they really can't function as transitional housing facilities. But all we're saying, all we would be saying is there is some duty not to be negligent. That's all that the duty would be. Don't be negligent in doing your job. If the fact pattern here, Your Honor, were that Mr. Anderson arrived and he displayed signs of the negligence issue, and it is before us in the sense that you're saying that the verdict was against, but the jury found negligence. So that's not the duty issue. The duty issue is don't be negligent. If you're going to accept murderers and rapists, let them do their job. Then you have to exercise due care so as to avoid risk to foreseeable plaintiffs. Exactly. And here what the plaintiffs are asking the court to do is to say that St. Leonard's had a duty to ensure the safety. Not to ensure, just not to be negligent. That is the duty, right, we're talking about. To take reasonable steps. Not to be negligent. Not to be negligent. Right. So as to avoid harm to the public at large. Right. But the duty is only not to be negligent. There's no duty to ensure. It is not your job to ensure. To exercise due care. I agree, Your Honor. I agree. The last topic I'd like to address, unless you have any more questions, is this business about insurance. Yes, please. The record shows that in the middle of trial, plaintiffs' counsel zoomed in on the contract provision mandating that St. Leonard's provide the state with proof of liability insurance. The provision was projected on a screen in front of the jurors for a period of minutes, not seconds. And the existence of the transcript of the colloquy in the court's chambers proves that. Plaintiffs dismissed this episode as a non-event. But the circuit court obviously didn't see it that way because it offered a curative instruction and it brought the issue up again later sua sponsi. No one knows for sure whether the jury read that provision. But given the enormity of the judgment and given that the jury knew this was a not-for-profit charity, it seems highly likely that the jury inflated the judgment because it knew St. Leonard's is insured. How do you verify that? There's no way of verifying it, Your Honor. Really, in the cases, I don't believe jurors are really ever polled and asked were you influenced by the reference to insurance. But here we would urge you to err on the side of fairness. And we believe that fairness demands a new trial.  Thank you, Mr. Jenkins. We'll reserve five to ten minutes for you on rebuttal. Mr. Aitken. Thank you, Your Honor. My name is Tim Aitken and I represent the plaintiffs. Please support. This brutal sexual assault of these plaintiffs should not have happened. There were many at fault. That was allowed during the trial. There was testimony by plaintiff's experts that there were other players that were at fault. But interestingly enough, plaintiff's own experts found SRM at fault. For example, with respect to their acceptance of Julius Anderson in the facility, which is a suitability test, it's not whether or not he is a sexually violent person, which was another test which was testified to at length during the trial, but is he a suitable candidate. Their own experts said. Counsel, if there's no duty, it doesn't matter if they're negligent, correct? You're right. I'll be happy to address duty. Right? We don't need to talk about whether they're negligent except in terms of the sufficiency of the evidence. The question is whether there's a duty. And I'll be happy to address that. There's three areas in which there could be a duty imposed. One is ordinary care, one is 319, and one is voluntary undertaking. But let me address your question with respect to that earlier case, the Johnson case, and has Illinois ever adopted 319. I know Illinois has adopted, and that's the Simpkins case, which is a 2011 case where the court very carefully went through the factors that need to be determinative of duty. And those factors are whether or not it's reasonably foreseeable, and I don't see how anyone can argue here, that a serial sexual predator would not be likely to strike again if given the opportunity. Is that reasonably foreseeable? Absolutely. It happened. It happened. Absolutely. But we look forward, not backwards. We do look forward. But you have to look backwards to determine whether or not there is a basis for making that determination, because as this court well knows, most of these determinations of duty are done at the pleading stage, and in some cases at the summary judgment stage. For example, Baylor and Abraham, which has been cited by counsel for the defendant, were both summary judgments. In this case, we have a full trial. We know that there was a legitimate basis for this court to find under the Simpkins analysis that there was a duty. Let's talk about whether the trial court ever did find that, because the record is at best money. Would you not agree as to whether the trial court ever found a duty? No. Okay. Tell me why it's not money. When the trial court says in the directed verdict, your motion is respectfully denied. It's a question of fact. I understand that's what he said, but I know what he did. He gave a duty instruction that said absolutely it was the duty of the defendant before and at the time of the occurrence to use ordinary care for the safety of the plaintiff. Right. And your opposing counsel would suggest that was a mistake because he had already said it's a question of fact. And the judge did the same thing on summary judgment, a different judge. Made the same confusing inconsistency, I would say, between saying it's a question of law and a question of fact. So can it be a question of fact? I think overall the law has been no. I mean, what they did, they proposed an instruction which was rejected. And what they said was if he was in control of it or he was in charge of it. He charged 319. He did not? Yes. But why that was inappropriate is there are many ways in which duty can be found. It's not just 319. It could be duty of ordinary care. It could be voluntary undertaking. You can't just have one instruction that just highlights the one basis for duty. The other thing is duty is a question of law. The cases have been uniform on that. Right. And I think it would have been inappropriate to give a jury instruction that asked the jury to determine what the legal duty was. But I believe, and your opposing counsel suggested one line of cases, I think also happens in retained control cases, that there's an embedded issue of fact in the duty question. And somebody's got to make that factual determination. Well, first of all, the judge makes the determination of whether or not there's a duty. And then whether there's a breach, it's determined by the jury, whether it's possibly caused, whether there's an injury. And in this case, I think it's clear in the record, regardless of what was said, and Justice McBeth, I know what Judge O'Hara said when he denied the summary judgment, but he also said in that same opinion that he found a duty. I know. And he also went through the 319 analysis and he said there's a duty. I know. And that ends with an unfortunate statement that's a question of fact. And Judge Lyons says the same thing. But what did he do? That's the critical part. He gave an instruction that as a matter of law, the duty is to use ordinary care. And I think you have to look at his conduct, not the words that were used by both judges. So we believe very strongly that there's a duty if you go through the factors that are in this case. And you believe that the top foot found that there was a duty. Yes, I do. Absolutely. And let me address this issue of public policy, because I know that case has been brought up, kind of led off the brief, and it was a large part of the argument today. They relied heavily on the Baylor v. Salvation Army case, Justice Simon, the one you mentioned from the Seventh Circuit. They went through a similar analysis, but when they got to the issue of public policy, here's what they said. In determining the existence of duty, the final factor that Indiana courts weigh is public policy. There is no doubt an important rehabilitative interest in assisting federal inmates in their transition to self-sufficient contributing members of the community. There also, however, is an extraordinarily important interest in protecting the members of the public from brutal assaults at the hands of those still serving a sentence to incarceration. We believe that given the importance of both of these factors, the Indiana courts would be trying to give determinative weight to either. And I think that's very important, Your Honor. Abraham, the Illinois case, Justice Thomas, ironically, who was not on the court then. It was a 1997 case. He says in analyzing that public policy, unlike a halfway house for inmates about to be released from prison, there is no concomitant interest in protecting the public here because defendants' residents are not inmates serving out part of a sentence. That is the public policy issue, and it is mixed. There is a weighing factor, but when you look at what duty you would be imposing upon them, if you find a duty and you go through those different factors, the duty you're imposing upon them is what they agreed to do in the contract, what they agreed to do when they said they would follow the law of the state of Illinois, what they agreed to do when they said that they would monitor him and make sure that the various criteria of his parole terms were met. There were limits, severe limits, put on them by IDOC in terms of how they could do that. They couldn't have armed guards. They couldn't have a locked-down facility, correct? That is correct, but we are not alleging any of those things. We are not saying you shouldn't have done it. You shouldn't have been able to keep him from leaving. But you're saying you had control. You could have stopped this. That's what you are alleging. That's the essence of your statement. No, honestly, Your Honor, it isn't. What we are saying, and I have the instruction right before me that was presented to the jury, they failed to screen Anderson properly before accepting him to the facility. They had an incomplete file. Even their own expert acknowledges that. They failed to notify local residents of Anderson's disappearance in a timely fashion. There was a neighbor who testified. They have a neighborhood group that they had known they would have looked for him as well. They failed to decline Anderson's continued occupancy when they knew Anderson was violating parole without GPS. GPS was never on Anderson during the entire six weeks that he was there. They knew it. This jury heard testimony from almost everyone we had seen that they knew GPS was not on. They knew that was a term of his parole, and they did nothing about it. They did nothing. That would have been a violation of his parole. He would have been picked up. He would have been back in prison for an additional year. At this instant, nothing would have happened. What we allege is that there was a failure to screen properly. There was a failure to monitor when he was there. And I'm not talking about keeping him from leaving the facility. I'm talking about GPS. Again, there was control. They were limited because they didn't have the monitoring information on the GPS, right? That went to IDOC. It went to IDOC, but they knew he didn't have it on him. And so did IDOC. And so they're both at fault. And they're both the approximate cause of the injury. But there's enough approximate causes here to go around. And I think the current approximate cause is this clerk well knows. And that's exactly what we have here. I'm going to ask you the same question I asked the opposing counsel. Where's the line? Where's the line? If you go home to your mother's and you're paroled, is your mother liable to go out and kill somebody? Where's the line? I think the line is drawn when you look at what they agreed to undertake to do. Well, your mother says, I'm going to take care of it. Mr. Eaton will be fine with me. He's not going to go out and hurt anybody, I promise. Here's what they agreed to do. And if the mother agreed to do this, I would be surprised. First off, there would be a screening. Are we capable of handling this person? Is this a suitable location? They did not have a complete file. And what they did was absolutely egregious according to their own expert. They never should have taken him in the first place. He should have served out his term in prison. But after they had him there, there was a question of whether or not they could have reported a parole violation. This is what the jury heard. The jury heard. No question. My question is did they have a duty? Because generally you have no obligation to protect one person from another person, correct? That is the general rule. The general rule unless, unless it's foreseeable. Unless you have a duty. Well, an exception to that general rule is that you have no obligation to protect someone from the third party's criminal conduct unless that conduct was reasonably foreseeable. That's one factor. That's one factor. That's a duty. And the question is do you have a duty? It's not just foreseeability. Because if I see that your partner over there is about to hurt you, I have no obligation to stop him. You're right. You do not. It's very foreseeable. He's looking angrier every second. I didn't realize that. So we have foreseeability. We have whether or not there's a likelihood of injury here. We have a recidivist. There's a guy who made a 300-mile trip to report himself, and he did it on his own. And he, yes, he did. Were there some things he did right? Yes. But did that excuse their failure to abide by his parole terms? There was testimony by a person on the Prison Review Board. I think his name was Jorge Montez. What he said is the purpose of those parole terms was to protect the community at large from Anderson. That was the purpose. And they did not abide by those parole terms, even though they were expected to, because they should have reported the fact that he did not have GPS, and he didn't. That was one of the claims that this jury held.  The duty of abiding by his parole terms was to protect the community at large. So there are legitimate lines that can be drawn between the mother who takes the son in. First of all, I think that they would never have found that to be a suitable place for parole with a serial sex offender. They might with a broker. They might with someone who wrote bad checks. But are you suggesting serial sex offenders should never be released ever under any circumstances? No. Absolutely not. I think it depends on the facts of the case. I think it depends on the facility where they're put, and if that facility can handle them, if that facility can state unequivocally we will abide by the parole terms, which in this case they did not, if that facility can properly monitor them and report parole viruses when they occurred. Yes, it serves a purpose. I am not arguing that. What I'm saying in this instance, they didn't do what they said they would do, and the jury heard that repeatedly. They didn't have a proper screening. They didn't report parole violations that they knew of. They didn't notify the local police. And by the way, one of the terms of the contract was that they incorporated the statute dealing with sex offenders and the people who violate parole. And one of the terms was if there's an emergency, then they are to report to the local police and IDOC. Throughout this trial, everyone was asked at SLM, did you report to the police? No. Did you report to the police? No. They didn't do it. And this parole officer testified that him leaving those premises was not only a parole violation, but was an emergency. She testified to that, and they didn't call the police. And there was testimony from the neighbor who said had they known, they would have been out there earlier. What about Tina Williams' involvement and her ability to control the situation? I think she was also a proximate cause. I think IDOC was a proximate cause. I think affiliated may have been a proximate cause. But we know from the case that there can be more than one proximate cause. Do I think there was any evidence, any indicia of evidence that there was any sole proximate cause? No, I do not. I think Judge Lyons made that determination absolutely correctly. One of the cases that they cite is a normal case involving an asbestos case, where in that case they didn't allow any evidence of sole proximate cause and didn't give them instruction. The court said they should allow any evidence. He did, Judge Lyons did allow any evidence. There was also the Weedy case where again the Supreme Court said that type of evidence should have been allowed in. But then they found as a matter of law that the remaining defendant, the other two had settled, was a proximate cause. And they said if there's a proximate cause to the injury done by that remaining defendant, then there could be no sole proximate cause as a matter of law. If you have a proximate cause, then no one could be solely involved. And that's a very interesting case. And I think that that's determinative of the case. Which case is that? It's the Weedy v. United-Gecki case. And it was a normal Supreme Court case involving a situation where part of a scaffolding fell and killed, actually severely injured I believe, the plaintiff which led to his death. And then the court analyzed the role. Let me just address one on that topic because proximate cause and sole proximate cause I know has been an issue in this case. In that case, there was an argument made that there should have been a sole proximate cause instruction because had the general contractor used a claim outside of the work area, that it never would have happened. That's the same argument that we can hear with respect to affiliated. Yet the Supreme Court found that the ultimate subcontractor dealing with the scaffolding was a proximate cause. So there can be more than one proximate cause as this Court well knows. Can you briefly address the insurance issue? Yes, I would be happy to. I think what's important is that when that issue came up, first of all, you had a screen where they were highlighting not the insurance issue. I think counsel misspoke when she said that. The insurance issue happened to be, the insurance paragraph happened to be on the same page on something else that they were highlighting. It was highlighted with the other points that they were going to. They were talking about the responsibilities under the contract. They went back to chambers. And they issued. The party notes. I'm sorry, yes, yes, yes, was the point. So they went back into chambers. They discussed it. There had been a motion for mistrial, which I think was not counsel the next day. And what I think this Court needs to pay attention to is that there were players on both sides. It said it was only up for seconds. It was up for minutes. It was this. It was that. Judge Lyons said that was only up for seconds. I didn't even notice it. I don't think the jury noticed it. There was no harm. But since you're fussing about it, I'll give you a curative instruction if you want it. And they said, no, we don't want it. Well, but you understand that. I understand. That would only highlight the problem. If they hadn't noticed it then, they'd notice it now. Don't pay any attention to that white elephant. Well, that would be like you could never have a curative instruction. I mean, curative instructions do tend to highlight it. And they chose not to have it. But I think the important thing is Judge Lyons saw the same thing. And he said he found it at no moment. He did not think the jury saw it. And I think we need to rely a lot on what he said because he was the person who was there. Justice Simon, you raised an issue about the cross-appeal, which is dealing with the tendered instruction. And I do want to comment on that for a couple of reasons. One. Special interrogatory. Special interrogatory. I apologize. Special interrogatory. Judge Lyons said it was never tendered to me. He said there's something in the transcript that indicates that they talked about doing it after he'd already denied a couple of special interrogatories that they attempted to produce. And he said no one ever handed me anything that was a tendered instruction. And that's required. He said there was something on a yellow pen, I think he said, that had been handwritten. No one tendered him that instruction. And that was the basis of this ruling. That instruction, by the way, goes back to the duty issue. And it dealt with was he in charge of. And at that point, there had already been rulings made that there was a duty of care. So any type of special interrogatory has to be consistent with what the other instructions are or the jury is going to be confused. So in this instance, it would have been improper for a number of reasons. But the primary one was it didn't make it to the record because there never was a tendered instruction. So that was the question. But do you disagree with counsel that if we think that it should have been tendered, that we can rely on the colloquy that is on the record without necessarily seeing the tendered interrogatory and the supplemental record? Do you agree with that? That the issue is before us. And I guess the issue is before us if we think there's a factual question simply on the instruction that was never, that everybody agreed was requested and not tendered, the 319 instruction. Correct? Yes. The transcript said that there was an effort made by the defendant to have that special interrogatory read. The transcript doesn't address the issue of was there a tendered instruction because Judge Lyons and fairly new. You're mixing up instruction and interrogatory. There was an instruction. There's a special interrogatory. So if we think that there's a factual issue that should have been submitted to the jury as to whether the 319 standard was met, that issue is preserved by the defendant simply by tendering the instruction. Correct? It would be an improper interrogatory because that is not the only basis for duty. That could not be inconsistent with the general verdict because there were two other basis for duty. One was voluntary undertaking and the other one was duty of ordinary care. So you can't highlight one basis for duty and say if they found he wasn't in charge of it, therefore that discounts the general verdict. I get that. But let me go back to a simpler question. If we believe that the question that embedded in the duty determination, which we agree needs to be made by the court, embedded in that is a factual question that should have been tendered to the jury, that issue is preserved. There's no waiver of that issue by the defendant. I would say there's no waiver, but I would say, and I would be very adamant about this, is it would have been an improper interrogatory to have given because it would not be something that would be inconsistent with the general verdict. Because there's other bases on which you could find duty. Exactly. But if they had, Judge Lyons had said, if I would give you a special instruction on 319, you could have said, well, I want the jury also instructed on the other ways that they could find duty. But Judge Lyons behaved through the instruction conference as though duty had been determined. Appropriately. I understand you say appropriately, but if we disagree, then the issue is in the record. That's all I'm saying. We could remit and say, retry this case and instruct the jury properly on the factual issues underlying duty. Except the door that you're opening is that then you would also have to instruct them as to the first simplest analysis of what we're going to care. The only way that they could find duty, you'd be turning the law upside down, in my opinion, if you did that. Yeah. But you're the law, so you get to make that decision, this court. But I do not think that's a road you want to go down because it is an issue of law and it would be improper, it seems to me. When most of these duty questions are decided at the motion to dismiss stage, Simpkins, for example, motion to dismiss. Doris McLean County, motion to dismiss. The Abraham and Bayer case, summary judgment. Rarely is there ever still an issue at the end of the trial. Now, I know they raised it, I know they raised it repeatedly, but they were also raising it not only as a 319. If you look at the attack on the directive verdict, it was 319. If you look at the summary judgment, it was 319. They were not going through the analysis for how many care and voluntary undertakings. Last question, which I also asked the opposing counsel. Yes. Don't you think 319 encompasses the Simpkins factor, is a way of looking at the four factors and saying, here, if all of this is true, everything that's in 319 is true, then as a matter of policy, we think duty should be imposed. Isn't that what 319 is about? Isn't that what the restatement is about? I think there's a difference. Simpkins says in the opinion that if you find a duty of ordinary care, you do not need to get to whether there was a special relationship. And 319 deals with special relationships. It's only after you determine under Simpkins that there's no relationship, using that legal term, as the court did, going through the four factors, that you then go to a special relationship. Is there a special relationship if there's no duty of ordinary care? And you don't have to get to 319. If under Simpkins you find that all those factors are met, 319 becomes irrelevant because you don't need a special relationship. It's only when you find that those four factors are not met and we submit those four factors are met very strongly. I'll reread Simpkins, but I read 319 as encompassing the same factors that are, say, laid out in Simpkins. That's how I read it. And I'm not arguing with you. All I'm saying is that if you go through the Simpkins analysis and you determine based on Simpkins that there's a duty, you do not need to get to the special relationship. That's the only thing that I'm saying, because if you found under Simpkins there is a duty, 319 becomes irrelevant. The facts in the Simpkins case bear that out because what they were trying to do with the appellate court in the 2nd District and the 5th District where there had been a dispute about whether or not there was a duty, they were trying to put them in the special relationship category and saying in one, well, she wasn't an employee, and that creates a special relationship. Another one says she wasn't invited on the land, so that's another special relationship. And Simpkins said, we don't need to get there. We can go through our own test for duty of care. And quite frankly, I think since Simpkins and since Doe, which filed with Simpkins I think in 2013, I think this whole notion of special relationship is going to be used very rarely because the court in Simpkins had a fairly broad statement with respect to, they said this court has long recognized that every person owes a duty of early care to all others to guard against injuries which naturally flows a reasonable and probable consequence of an act. Such duty does not depend on contract privity or interest of proximity or relationship, but extends to remote and unknown persons. Thus, if a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury. That is so broad that I don't think you're going to need to get into special relationships, but I'm not saying that doctrine is gone. I'm just saying it's unnecessary because that's what the court was dealt with. On that note, two-minute warning. All right. Thank you very much. Two minutes. I believe I wanted to be able to address everything that was asked by the court of counsel. I know, again, Judge McCree, you had asked counsel a question with respect to was IDOC notified. They notified AMS, and by the way, they had already received notification because of electronic monitoring bracelet, but there was testimony by Alyssa William Schaefer, who was the head of the sex offender unit of IDOC, and said, no, I was never called when they were supposed to. So that was her testimony, and she filed them for not doing it. And there were a number of things that they didn't do that I haven't mentioned, but I think the principal ones is they never should have taken them in the first place if they'd inept with screening. Our expert said, and this is what the jury heard, that he would have been rejected had they had the complete file. Their own expert said that was an egregious screening, and they never reported the parole violation of the GPS, and that also was negligent. And they never called the police, even though his own parole officer said that was an emergency. These were the basis of the negligent acts that this jury weighed and decided in deciding this verdict in favor of these plaintiffs. And so I think there's, in my opinion, clearly duty here, and then how you now analyze it, and I didn't talk much about voluntary undertaking, but clearly when you voluntarily undertake a duty, you have to do it in a way that you don't commit negligence. It's a duty of ordinary care, and the fact that it was third parties is irrelevant if that's foreseeable. And the cases are clear on that, and we've cited them in our brief. And, Your Honors, we believe that the jury was right. Judge Lyons was right that there was a duty. He probably instructed this jury, and we would respectfully ask for you to affirm the verdict. Thank you. Thank you. Ms. Smith, you have ten minutes. Thank you. I have one big question before you start. Sure. Can you address Mr. Eaton's argument that there's three different ways you could find duty, and I guess the fact that it's unclear which of those the trial court relied on if the trial court did find duty, but how did those play out throughout the trial court? How did they fit together in your mind? I'll get to your question in just one moment. I have a good lead-in to it, I think. I want to put to rest, I hope, this notion that Judge Lyons decided the duty question because I already told you what he said at the directed verdict stage. But during the jury instruction conference, when St. Leonard's asked for the non-pattern instruction, Judge Lyons' explanation was basically, well, I prefer to use standard instructions, pattern instructions. And when St. Leonard's counsel objected, he said, and I'm reading from the transcript now, this is in volume 26 at page 230, the court said about the instruction he was giving, it doesn't say there was a duty. It just says what the duty is. The transcript isn't a model of clarity, but I don't think it can be reasonably interpreted that the circuit court decided the duty question. He kicked that question to the jury. But he didn't. He never instructed them as to how they were supposed to determine it. He never asked. The question of law wasn't supposed to go to a jury. I agree, although there may be these fact issues that would be embedded, and then he would decide it. I don't know, but there's nowhere in the transcript where he identified the source of the duty, the public policy considerations that may have played into his ruling, if he did indeed rule. It's mysterious. All I know is that I don't see any indication in the transcript that Judge Lyons decided this question, and it appears he sent it to the jury, but the jury was not instructed on the law. And when you moved your summary judgment and you moved for a directive verdict, you moved for, I think, a judgment notwithstanding the verdict, did you address all three possible bases of a duty? Your Honor, I was not trial counsel. My understanding is that the focus was largely on the Section 319 take charge duty. I believe voluntary undertaking doctrine was brought up, to be fair, but that was not the focus. And whether ordinary negligence principles played into it, maybe. But, you know, all three duty sources require foreseeability. And counsel is insistent that because Mr. Anderson was a serial sex offender, any fool would have known that he might reoffend. The problem with that analysis is that the expert who testified on foreseeability, Dr. Goldstein, testified there was no way that an untrained lay entity like St. Leonard's had no way of knowing whether Mr. Anderson presented a high risk. It doesn't have to be a high risk, does it? It doesn't. Under 319, Your Honor, the standard is a likely risk. Likely suggests to me that it's, you know, getting up there. Okay. I don't know if I need to put a percentage on that. I certainly don't. And in the Crompton case, which we discuss in our briefs, it was a similar fact pattern where a psychiatrist had examined a girl who was suffering from psychosis. She prescribed her anti-psychosis medication. Walgreens shorted the supply. The girl had a lapse in her medication and committed suicide. And the court on a JNRV held that if the expert didn't foresee that she was a harm to her, presented a risk of harm to herself or others, then how could the lay pharmacy technicians have anticipated that? We think the Crompton case is highly analogous. In addition, as you pointed out, Your Honor, Mr. Anderson traveled 300 miles by himself without shackles, monitoring, or an escort. He could have easily absconded. But he showed up at St. Leonard's. He did at one point. During that trip, he could have run away. But he showed up at St. Leonard's door, and for a couple of weeks he appeared to be getting on. Hindsight is 20-20, but we're talking about foreseeability here. Going back to foreseeability, I'm looking at the restatement. Knows or should know to be likely to cause bodily harm. So going back to Mr. Eaton's point that there was inadequate screening, if, in fact, you should have known that he was likely.  If St. Leonard's had received the full history of Mr. Anderson, they would have seen. They had demanded the full history. They demanded it, and they should have. But would it have made any difference? Because the experts had the full history. They knew about his incidents in prisons in the 1980s, his sex crimes in the 1970s. But it also knew that in the 1990s and the 2000s, he had been diagnosed as no longer psychotic, no longer an escape risk. So maybe sex offenders should be in prison for life. I don't know. But sometimes they are paroled, and you need a gatekeeper. These experts retained by the state to make the decision. St. Leonard's wasn't qualified to make that decision. It was reasonable, Dr. Goldstein testified, to rely on affiliated's conclusion. A lot of the issues that counsel raises, I think, are red herrings. We hear over and over again how St. Leonard's failed to call the police. But that would only matter if there were proof that the police could have apprehended or would have apprehended Mr. Anderson before he got too far away. Again, Captain Kuczynski testified, and there's no rebuttal evidence, that had 911 been called, the police would not have launched a search for him. On the sole proximate cause issue, Your Honor, it seems that it's rarely, if ever, appropriate to grant a motion in limine barring the defendant from developing its sole proximate cause defense. But you were given some leeway to develop some parts of the sole proximate cause defense, correct? I'm a little confused as to what the ruling really kept you from writing. There are a number of confusing rulings, and this is one of them. The circuit court said on the front end, you may not argue that affiliated was the sole proximate cause, because I've already decided that it can't be the sole proximate cause. Some evidence of affiliated's conduct made its way into the record, and the circuit court explained that he did that so that St. Leonard's wouldn't have to defend the case in a vacuum. But mid-trial, and the record shows this, Judge Lyons disallowed St. Leonard's counsel from questioning one of the witnesses on evidence bearing on sole proximate cause. So it's not true that St. Leonard's was permitted to fully develop this defense. The failure to instruct the jury on sole proximate cause at the end of the case only compounded that error. The law's clear that a defendant has the right to try to prove the defense, and if there's some evidence in the record and it only has to be slight and unpersuasive, then the defendant is entitled to the instruction. If it is slight and unpersuasive, can that then be harmless error? I don't believe, Your Honor. I believe it would only be harmless error if the court were to decide that affiliated didn't do anything that contributed or could possibly have caused the injury here. I don't think that's a fact pattern. Nobody's arguing that. Nobody's arguing that. And the case that's cited in the briefs is where there was a snowstorm, and there were traffic accidents, and the defendant wanted to point to the snowstorm as the sole proximate cause. But as the court noted in saying there was harmless error, cars were able to stop in the snowstorm, so it couldn't possibly have been the sole proximate cause. This case is different. Back to the insurance issue. The fact that Judge Lyons, the circuit court, offered the curative instruction is important. Is it also important that he determined that it really was not up for very long or anything the jury would have seen? Don't we need to rely on him as our eyes and ears in the trial? Sure. It's subject to an abuse of discretion standard, and Judge Lyons was in the courtroom. None of us were. But the record shows, the transcript shows that Judge Lyons was in chambers, and this provision was on the screen for the jurors to see. It wasn't a few seconds. It had to be minutes. And I have to point out that Judge Lyons asked counsel to take it down, but then after that displayed it again. Again, no one knows whether the jury read it. It's a brief passage, however. It shouldn't have been up there in the first place. Should this have been taken de novo? Should this have been taken de novo? The insurance issue? Your Honor, I believe it's an abuse of discretion standard. But given the facts here, we believe the circuit court abused its discretion by not declaring a mistrial once this happened. Finally, in the Baylor case, which is the Seventh Circuit case, with a similar fact pattern, on the public policy prong of the test, the court basically held it was a wash, that we had to balance public safety with what halfway houses accomplish. But our argument is that public safety would be adversely affected by imposing a duty here because St. Leonard's and halfway houses have success in rehabilitating parolees so that they don't go out and reoffend again. It may be counterintuitive, but we believe that allowing St. Leonard's to continue its work and allowing other transitional housing facilities to do this work enhances public safety by making it less likely that former convicted felons will reoffend. Any more questions? Thank you very much. Thank you, Your Honors. Ms. Judkins, Mr. Eaton, the court is taking this matter under advisement. The court recognizes that we have very competent counsel on both sides of this case and as competent counsel, I'm sure you recognize that our decision very well could be solely for one party and entirely against another. Only one winner and one loser. Experienced attorneys, however, have within their capacity to make themselves a winner. You both could be winners in this case. If you use the next few weeks to discuss this matter between yourselves and see if you can reach an amicable sum, otherwise our case, our opinion, will be forthcoming probably within the next five to six weeks. The court is adjourned. Thank you.